# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                      No. CR 05-186 JB

JAMARE BAITY,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Jamare Baity's Motion to Suppress Evidence Resulting from the Unlawful Search of His Person, filed May 3, 2005 (Doc. 29). The Court held an evidentiary hearing on this motion on September 21, 2005. The primary issue is whether the police officers had an articulable and reasonable suspicion that Baity was armed and dangerous to justify the patdown of Baity. Because the Court finds that the United States has not met its burden, and that the police officers did not have an articulable and reasonable suspicion that Baity was armed and dangerous, the Court will grant Baity's Motion to Suppress.

## STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's

confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982).

In deciding such preliminary questions, the other rules of evidence, except those with respect to

privileges, do not bind the Court.   See Fed. R. Evid. 1101(d)(1).  Thus, the Court may consider

hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

## FINDINGS OF FACT

1.      On August 12, 2004, Eric Coleman and his brother, driving a silver four-door Buick,

picked up Baity and Mark Stubbs to give them a ride.  See Transcript of Hearing at 121:14-122:5

(Eric Coleman)(taken September 21, 2005).[1]

2.      The vehicle contained four occupants.  See id. at 22:12-15 (Albuquerque Police

Department ("APD") Officer Scott Norris); 102:20-22 (Special Agent Brandon Garcia); 121:16-

124:4 (Coleman).

3.      Baity was seated in the rear left passenger seat -- behind the driver of the vehicle.  See

id. at 26:21-24 (Norris); 80:13-14, 82:17-21 (APD Officer Lawrence Saavedra); 102:23-24 (Garcia);

128:17-18 (Coleman).

4.      APD Officer Scott Norris encountered the vehicle on Bell Avenue, just west of

Louisiana Boulevard, in Albuquerque.  Norris did not see a license plate on the vehicle and was

unable to read the temporary license tag.  See id. at 19:8-24, 48:6-16 (Norris).

5.      Norris initiated a stop of the vehicle.  See id. at 20:18-19.  Although Norris could see

the temporary tag, he could not see the tag's date.  See id. at 20:14-15, 48:6-16.  The vehicle's

temporary license tag, including the expiration date, was not legible to Norris.  See id. at 20:3-19,

_____

[1]  The Court's citations to the transcript of the hearing refer to the Court Reporter's original,
unedited version.  Any final transcript may contain slightly different page and/or line numbers.

48:2-16.  Improperly displaying a temporary tag is a traffic violation.  See id. at 20:14-17; N.M. Stat.

Ann. § 66-3-18 (2005).

      6.      After he stopped the vehicle, Norris followed standard procedure and radioed his

location and the stop's purpose.  Norris also asked for assistance on his radio frequency and

approached the vehicle.  See Transcript of Hearing at 20:19-21:10 (Norris).

      7.      The stop occurred in the early evening around 5:00 or 6:00 p.m.  See id. at 157:5-11,

158:21-25 (Jamare Baity).

      8.      Ten to fifteen seconds after Norris stopped the vehicle, APD Officer Lawrence

Saavedra and Special Agent Brandon Garcia arrived in their own police vehicle to assist Norris.  See

id. at 21:14-16, 23:22-24:6 (Norris); 101:21-24 (Garcia).  Saavedra heard Norris radio in the traffic

stop and, as he drove by, he noticed that the vehicle had more than two occupants, so he decided to

stop and assist Norris.  See id. at 78:25-79:12 (Saavedra).

      9.      Three other officers arrived at the scene as well; a total of six officers were at the

scene.  See id. at 46:22-25, 62:20-23 (Norris); 160:21-22 (Baity).

      10.      Upon arriving, Saavedra approached the vehicle; Norris was already standing next

to the vehicle.  See id. at 23:16-24:1 (Norris); 80:13-18 (Saavedra); 101:21-102:1 (Garcia).

      11.      Norris told the driver why he stopped the vehicle -- he could not see the temporary

tag -- and asked the driver for his driver's license, vehicle registration, and insurance.  See id. at

23:12-14 (Norris); 124:12-125:11 (Coleman).  The driver gave Norris his license and an insurance

card.  See id. at 47:17-19 (Norris); 125:9-11 (Coleman).  Norris was prepared to let the vehicle's four

occupants leave after he finished the stop.  See id. at 48:22-49:2 (Norris).

      12.      At that time, one of the officers, Saavedra, walked around the vehicle and approached

the rear right passenger side door.  See id. at 50:5-8 (Norris); 80:7-11 (Saavedra); 126:21-127:21 (Coleman); 162:8-10 (Baity).

13.     As Saavedra approached the vehicle, Stubbs turned and gave Saavedra a look that Saavedra interpreted as saying Stubbs was going to either fight or run.  See id. at 81:4-10 (Saavedra); 104:10-14 (Garcia).

14.     Saavedra began to speak to Stubbs, who occupied the right rear passenger seat and who was seated next to Baity, and asked him in an aggressive tone and with a raised voice: "What's with the hard look?"   Id. at 24:11-25:15 (Norris); 81:8-13; 89:14-90:8 (Saavedra); 104:10-14 (Garcia).

15.     Saavedra's question occurred just after Norris had finished asking for the driver's licence and insurance card, and before Norris had completed the traffic stop.  See id. at 69:16-70:10 (Norris).

16.     Saavedra did not ask Stubbs if he wanted to run, nor did he inform Stubbs that he would give him a head start if he wanted to run.  See id. at 56:17-22, 58:12-16, 70:11-15 (Norris) 84:11-14, 90:9-91:8 (Saavedra); 104:17-21 (Garcia).[2]

17.     The passenger was later identified as Mark Stubbs.  See id. at 25:9-11 (Norris).

_____

[2] Coleman and Baity testified to a different version of events: (i) officers told Stubbs "you're a runner, and you're a bad ass"; (ii) officers pointed a gun in Stubbs' face and in Baity's face; (iii) officers told Stubbs "we'll give you a ten second start"; and (iv) Stubbs started crying and told the officers "I'm complying sir [] I'm complying."  Transcript of Hearing at 126:24-128:7 (Coleman) 160:6-7, 162:19-23 (Baity).  The Court, however, finds that Saavedra's testimony, in combination with Garcia and Norris' testimony, was credible, and that Coleman's testimony and Baity's testimony on this point were not.  Baity heard Coleman's testimony in Court and when Baity took the stand, testified similarly to Coleman on what the police said, but differently on how Stubbs reacted.  Although the rule, see Fed. R. Evid. 615, was not invoked, no witnesses, other than Baity, were present during testimony, see Transcript of Hearing at 185:11-17, enhancing the credibility of the officers.

18.     Stubbs became agitated, started screaming unintelligible words, and started crying, which raised safety concerns for the officers.  See id. at 26:5-27:25 (Norris); 81:14-24 (Saavedra); 103:17-104:16 (Garcia); 128:4-7 (Coleman); 162:22-163:17 (Baity).

19.     Saavedra and Norris observed Stubbs reaching behind his back and into his pants, as if he were reaching for something.  See id. at 26:5-27:25 (Norris); 81:14-83:8 (Saavedra);

20.     Saavedra was unable to see Stubbs' hands clearly, but knew that his hands were behind him, and was concerned that either he had a weapon or he might be transferring a weapon to Baity in the back seat.  See id. at 82:1-83:6, 85:17-19 (Saavedra).

21.     Norris saw Stubbs put his hands directly behind him and it appeared to Norris that Stubbs was reaching down the back of his pants.  See id. at 26:5-7 (Norris).

22.     In addition, Stubbs did not comply with Saavedra's commands to keep his hands where the officers could see them.  See id. at 29:14-30:5 (Norris); 81:22-82:2 (Saavedra).

23.     Norris and Saavedra drew their weapons and ordered all of the individuals out of the car for officer safety purposes.  See id. at 29:3-31:3 (Norris); 85:11-23 (Saavedra); 106:21-25 (Garcia).

24.     There is no indication that Baity was doing anything wrong or acting suspiciously. Baity sat quietly looking straight ahead, with his hands at his sides.  None of the other passengers said anything; they were just looking at Norris.  See id. at 21:19-25, 27:4-9, 28:15-17, 53:1-54:8, 58:6-9 (Norris); 94:7-10 (Saavedra); 105:11-22 (Garcia).

25.     Eight to ten inches separated Baity and Stubbs, and there was no divider or console between them.  See id. at 26:22-25 (Norris).

26.     Norris would have let Baity and the front passenger in the car leave after asking

-5-

everyone to exit the vehicle.  See id. at 59:2-15.

27.     After the four individuals exited the vehicle, Norris, Saavedra, Garcia, and another officer at the scene patted them down for possible weapons.  See id. at 30:12-31:3 (Norris); 85:20-86:23 (Saavedra); 107:7-108:16 (Garcia); 131:14-18 (Coleman).

28.     Garcia first ordered Baity to put his hands on the top of his head.  See id. at 115:1-116:7 (Garcia).

29.     Before patting Baity down, Garcia asked Baity if he had any drugs or weapons on his person.  See id. at 110:3-9, 115:1-116:7.

30.     Baity stated that he did not have any drugs or weapons.  See id. at 110:3-9.

31.     During the patdown, Garcia found a plastic bag containing what he believed to be several rocks of crack cocaine in the waistband of Baity's clothing.  See id. at 108:18-109:21.

32.     Garcia testified that he performed a patdown on Baity because he did not know what occurred between Baity and Stubbs.  Garcia could not see Stubbs' hands, but could see that his shoulders were moving, and that he was in close proximity to Baity.  See id. at 103:17-23, 108:9-14.

33.     After Garcia discovered the crack cocaine and placed Baity in handcuffs, Baity whispered that he also had a gun in his pocket.  See id. at 110:3-9.

34.     At that time, Garcia discovered a loaded .22 caliber, semiautomatic handgun in Baity's pocket, along with two separate magazines.  See id. 110:3-21.

35.     The stop occurred in a high crime area, an area associated with violence, drugs, and prostitution.  See id. at 10:1-17:16 (Norris); 75:8-78:10 (Saavedra).

36.     Norris started following the car just outside of a high crime area known as the "war zone."  Id. 42:19-44:11 (Norris).

37.     Norris and Saavedra had encountered vehicle occupants carrying weapons, including firearms, several times, and Saavedra had previously been told by vehicle occupants that they thought about using the weapons if they had been given the chance.  See id. at 10:8-11:25 (Norris); 75:8-77:12 (Saavedra).

38.     The Court finds that the APD officers that testified were more credible than Baity and Coleman.  The officers were consistent with each other in their testimony.

## PROCEDURAL BACKGROUND

Baity moves the Court to suppress all evidence that law enforcement officers seized, including any firearm, ammunition, and controlled substances, and any statements that Baity made, as a result of the allegedly illegal arrest and search of his person on August 12, 2004 in violation of his rights under the Fourth Amendment to the United States Constitution.  See Defendant's Motion to Suppress Evidence Resulting From the Unlawful Search of His Person ("Motion to Suppress") at 1.  Baity requested that the Court hold an evidentiary hearing on this motion.  See id. at 6.  The United States, through Assistant United States Attorney Stan Whitaker, opposes this motion.  See id.

## FOURTH AMENDMENT LAW

The touchstone of an analysis of a seizure under the Fourth Amendment is reasonableness. See Pennsylvania v. Mimms, 434 U.S. 106, 108-109 (1977).  "Evidence seized pursuant to a warrantless search, once questioned, must be suppressed unless the search and seizure come within an exception to the Fourth Amendment requirement of a warrant. 'The burden is on those seeking the exemption to show the need for it.'"  United States v. Sporleder, 635 F.2d 809, 813 (10th Cir. 1980)(quoting Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971)).

"A law enforcement officer may constitutionally conduct a warrantless pat-down search of a person if the officer harbors an articulable and reasonable suspicion that the person is presently armed and dangerous." United States v. Wald, 208 F.3d 902, 906 (10th Cir. 2000)(citing Terry, 392 U.S. 1, 21, 27 (1968) and United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996)). "[T]o come within the Terry exception," the government has the burden to "show that their patdown was supported by a reasonable belief that defendant was armed and presently dangerous." United States v. Sporleder, 635 F.2d at 814 (citation and internal quotations omitted). Courts are to view the officer's conduct through common sense and ordinary human experience. See United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994)(citation omitted).

"A routine traffic stop is a seizure within the meaning of the Fourth Amendment." United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996)(citing United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995)). The traffic stop is an investigative detention and is analyzed according to the principles set forth in Terry. See United States v. Leos-Quijada, 107 F.3d 786, 792 (10th Cir. 1997)(citation omitted). A routine traffic "stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Shareef, 100 F.3d at 1500 (citations and internal quotations omitted).

Police officers are "authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a Terry stop." United States v. Melendez-Garcia, 28 F.3d at 1051 (quoting United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)). "[A]n officer making a traffic stop may order both the driver and passengers to exit the vehicle pending completion of the stop because 'the additional intrusion on the passenger is

minimal." United States v. Dennison, 410 F.3d 1203, 1211 (10th Cir. 2005)(quoting Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) and citing Pennsylvania v. Mimms, 434 U.S. at 111). This intrusion, in the interest of officer safety, does not require any "particularized suspicion of personal danger." United States v. Holt, 264 F.3d 1215, 1222 (10th Cir. 2001)(citations omitted). "A police officer may also perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." United States v. Dennison, 410 F.3d at 1211 (quoting Knowles v. Iowa, 525 U.S. 113, 118 (1998)(internal quotations omitted)).

The United States Court of Appeals for the Tenth Circuit, in determining the reasonableness of an investigative detention, applies a two-prong test: (i) "whether the officer's action was justified at its inception"; and (ii) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Shareef, 100 F.3d at 1500 (quoting Terry v. Ohio, 392 U.S. at 20). "The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." United States v. Shareef, 100 F.3d at 1500-01 (quoting United States v. Perdue, 8 F.3d at 1462).

"[M]ere propinquity to others independently suspected of criminal activity is insufficient, standing alone, to create an articulable suspicion to support a Terry frisk." United States v. Maddox, 388 F.3d 1356, 1365 (10th Cir. 2004)(citation and internal quotations omitted). In determining whether an officer has reasonable suspicion, the Tenth Circuit looks at the "totality of the circumstances." United States v. Shareef, 100 F.3d at 1505 (quoting United States v. McRae, 81 F.3d 1528, 1534 (10th Cir. 1996)).

Courts have recognized the potential dangers of traffic stops:

The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they stop a vehicle.  The officer typically has to leave his vehicle, thereby exposing himself to potential assault by the motorist.  The officer approaches the vehicle not knowing who the motorist is or what the motorist's intentions might be.  It is precisely during such an exposed stop that the courts have been willing to give the officers wide latitude . . . to discern the threat the motorist may pose to officer safety.

An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped.  Every traffic stop, after all, is a confrontation. The motorist must suspend his or her plans and anticipates receiving a fine and perhaps even a jail term.  That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop.  Resort to a loaded weapon is an increasingly plausible option for many such motorists to escape those consequences, and the officer, when stopping a car on a routine traffic stop, never knows in advance which motorists have that option by virtue of possession of a loaded weapon in the car.

United States v. Holt, 264 F.3d at 1223 (citation and internal quotation omitted).  "[T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer."

United States v. Dennison, 410 F.3d at 1211 (quoting Maryland v. Wilson, 519 U.S. at 413).

Evidence is not considered "fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

## ANALYSIS

The detention, at its inception, was lawful, as it was based on an observed traffic violation. The scope and duration of the stop up until the point when Stubbs reacted to Saavedra's "hard look"

comment were reasonably related to the circumstances which justified the interference in the first place, and thus the question by Saavedra concerning Stubbs' "hard look" was lawful. Finally, although the officers presented objective articulable facts that show a reasonable suspicion that Stubbs was armed and dangerous, that suspicion was not reasonable in its extension to Baity.

## I.      THE STOP WAS LAWFUL AT ITS INCEPTION.

The initial traffic stop was lawful. Norris testified that the temporary tag was illegible and that this is a traffic violation. See Transcript of Hearing at 19:8-20:19; 48:2-16 (Norris). See also N.M. Stat. Ann. § 66-3-18. Thus the stop was based on an observed traffic violation or on at least a reasonable articulable suspicion that a traffic or equipment violation occurred or was occurring. See United States v. Shareef, 100 F.3d at 1500. In addition, Baity's counsel stated at the hearing that Norris had a right to stop the car in which Baity was riding because of the illegible tag. See Transcript of Hearing at 173:11-23.

## II.     "WHAT'S WITH THE HARD LOOK" DID NOT EXCEED THE SCOPE OF THE INITIAL TRAFFIC STOP.

Baity contends that, when Saavedra approached Stubbs and asked him about the "hard look," Saavedra unnecessarily interjected himself into the situation and that this went beyond the scope of the initial traffic stop. See Defendant's Motion to Suppress Evidence Resulting From the Unlawful Search of His Person ("Defendant's Motion to Suppress") at 4-5; Transcript of Hearing at 176:4-19, 183:1-25. The Court does not believe, however, that Saavedra's question was beyond the scope or duration of the traffic stop.

In determining the reasonableness of the investigative detention, the Court looks to the totality of the circumstances. As to the detention's duration, Norris testified that he had just finished

asking for the driver's license and insurance card, and that he was not finished with his traffic stop when Saavedra asked the question.  Thus, Saavedra's question did not exceed the duration of the traffic stop.

The Court also does not believe that the question was beyond the scope of the traffic stop. Norris testified that it is standard operating procedure for multiple officers to arrive on the scene of a traffic stop in that part of town.  See id. at 20:19-21:10, 44:12-45:19 (Norris).  Saavedra was behind the vehicle in the cover position on Stubbs' side opposite Norris so that he could observe the occupants for the safety of Norris.  See id. at 81:4-18 (Saavedra).  He did not further interject himself into the traffic stop until Stubbs turned around and gave Saavedra a look that Saavedra interpreted as Stubbs deciding whether to fight or run.  See id. at 81:4-10, 81:8-13, 89:14-90:8.  Based on Stubbs' look, Saavedra's minimal further interference of asking Stubbs "what's with the hard look" did not go beyond the scope of the traffic stop.

Even if the question did go beyond the scope of the traffic stop, it was reasonable based on the totality of the circumstances.  The Tenth Circuit held in United States v. Holt, 264 F.3d 1215 that "the government's interest in officer safety outweighs a motorist's interest in being asked about the presence of loaded weapons . . . even when the officer lacks particularized suspicion that the motorist possesses loaded weapons and regardless of whether the officer subjectively fears the motorist." 264 F.3d at 1226.  Similarly here, the government's interest in safety outweighs the passenger's interest in not being asked "what's with the hard look," in these circumstances.[3]  Saavedra's question was

---

[3] If the Court had found Baity's and Coleman's versions of events credible, and that Saavedra had taunted Stubbs and invited Stubbs to run, the Court would find that such action would not be within the scope and duration of the initial traffic stop, and would not be reasonable based on the look given by Stubbs.

reasonable based on the totality of the circumstances -- the stop occurred in a high crime area, "the war zone," the officers had extensive experience in that area where occupants of vehicles had carried weapons and some had even told Saavedra that they thought about using the weapons if given a chance, and Stubbs gave Saavedra a look that concerned Saavedra enough to ask Stubbs about it.

## III.   THE PAT DOWN OF BAITY WAS NOT BASED ON ARTICULABLE FACTS SHOWING A REASONABLE SUSPICION THAT HE WAS ARMED AND DANGEROUS.

Although the Court believes that the officers had an objectively reasonable suspicion based on articulable facts and the totality of the circumstances to perform a Terry frisk on Stubbs, the Court does not believe that articulable facts based on the totality of the circumstances extend that reasonable suspicion to Baity.  The Court will therefore suppress the drugs found on Baity from the pat-down search, as well as all other evidence that is considered a fruit of the poisonous tree -- the gun, the ammunition, and any incriminating statements that Baity made as a result of his arrest, such as any statements made later that day to the Bureau of Alcohol, Tobacco and Firearms.

The United States has not sufficiently met its burden in showing that the officers had a reasonable suspicion based on articulable facts that Baity was armed and dangerous.  Although a police officer may order occupants out of a car without particularized suspicion, see United States v. Holt, 264 F.3d at 1222, a police officer may conduct a pat-down search of passengers only "upon a reasonable suspicion that they may be armed and dangerous."  See United States v. Dennison, 410 F.3d at 1210.  The United States contends that, because the stop occurred in a high crime area, there were multiple occupants in the car, and the officers did not know whether Baity had a gun, the officers reasonably suspected that Baity was armed and dangerous.  The testimony of Saavedra, Norris, Garcia, and Baity shows that Stubbs started screaming, crying, putting his hands behind his

-13-

back and down his pants, and that he did not comply when the officers ordered him to show them his hands.

These facts, in combination with the area of the arrest and the number of occupants, are sufficient to support a reasonable suspicion that Stubbs was armed and dangerous such that the officers were justified in doing a patdown of Stubbs. The United States would like the Court to go one step further, however, and find that such justification extends to Baity. The Court will not extend this justification to Baity. Baity sat quietly, without moving during the entire incident, and his hands were either in his lap or at his sides resting on the seat. He did not make any furtive movements, or in any way give any indication of suspiciousness or dangerousness.

Saavedra testified that he was worried that Stubbs was reaching for a gun or that he could pass a gun to Baity. The facts that the United States presents, however, do not support the reasonable inference that a gun was passed to Baity. The testimony is clear that Stubbs was moving his hands behind his back. Although there was no divider between Stubbs and Baity, there was a space of eight to ten inches separating Baity and Stubbs. There is no testimony that Baity leaned towards Stubbs or that Stubbs leaned towards Baity. There is also no testimony that Stubbs' hands cleared the open area between them towards Baity.

The evidence more strongly supports the opposite belief. Norris said that he could see in his vision that Baity's hands were resting at his sides. Although Saavedra could not see Stubbs' left hand, Norris testified that Stubbs' hands were directly behind his back. Norris also testified that he would have let Baity and the front passenger leave after they were ordered out of the vehicle. Norris had a clearer view of Baity, and of Stubbs' left side, than did Saavedra, and he was prepared to let Baity leave. He also did not testify that he was afraid at the time that a gun was being passed, or that

-14-

he saw Stubbs or Baity lean into each other or any hands move towards the other person.  Based on this testimony, the officers did not have a reasonable suspicion such that Stubbs had passed a gun to Baity to patdown Baity even though they were in a high crime area.  The only person who caused any commotion or did anything suspicious was Stubbs.  Rather than having an "articulable and reasonable suspicion that [Baity was] presently armed and dangerous," United States v. Wald, 208 F.3d at 906, the officers merely did not know.   See Transcript of Hearing at 108:12-14 (Garcia)("[Y]ou know I don't know what happened between Mr. Stubbs and Mr. Baity, so that's why I'm going to pat him down because I don't really know.").  There will always be things that officers do not know; it is a dangerous job fraught with unknown risks.  But if the Court allows this evidence merely because the officers did not know, the Court will not be true to the "articulable and reasonable" standard.

The United States contends that United States v. King, 990 F.2d 1552 (10th Cir. 1993), stands for the proposition that when an officer determines that a defendant may have a weapon within his immediate reach, the officer is justified in ordering the defendant out of the vehicle and detaining the defendant to ensure the officer's safety during the contact.  See Government's Response to the Defendant's Motion to Suppress Evidence ("Response"), filed May 24, 2005 (Doc. 35).  This case is distinguishable because the officer in King plainly saw the loaded gun in the defendant's reach, whereas here, the officers never saw a gun, and only believed that Stubbs may have been reaching for one or trying to transfer one.  The Tenth Circuit in King stated: "Officer LeMasters' observation of an apparently loaded pistol within Defendants' immediate reach would justify her separation of Defendants from the pistol in order to ensure her own safety during the encounter." United States v. King, 990 F.2d at 1561.  Here, the police did not observe an apparently

loaded weapon in Baity's reach, and the seizure was not limited to further detention, but instead resulted in a patdown of Baity. The officers here may have been justified in further detaining Baity and asking him questions, but there is not sufficient evidence that the officers were justified in doing a patdown of Baity.

The facts here are distinguishable from Pennsylvania v. Mimms, where the Supreme Court of the United States found that a police officer had articulable reasonable suspicion to patdown a driver after the driver exited the vehicle, and the officer observed a bulge in the driver's jacket that may have been a weapon. See 434 U.S. at 111-12. Here, there was no such evidence that Baity may have had a weapon. There was no bulge in Baity's clothing, he was sitting still with his hands at his sides, and there is not evidence to show that Stubbs may have transferred a gun to Baity.

In some circumstances, it is permissible for officers to rely on a joint illegal enterprise theory to sustain a Terry search, even in the absence of particularized suspicion. See United States v. Dennison, 410 F.3d at 1211-1212 (citing Maryland v. Pringle, 540 U.S. 366 (2003)). In United States v. Dennison, the Tenth Circuit held that the totality of the circumstances justified a protective sweep of a passenger compartment. See id. at 1212. The Court found the following facts sufficient to support a reasonable and articulable suspicion of the defendant's threat to officer safety: (i) officers knew that the defendant's companion had "about four arrest warrants, including a felony arrest warrant for a weapons violation, and, importantly, admitted involvement with a domestic dispute earlier that evening"; (ii) both men were found in the defendant's truck outside an apartment complex at 3:00 a.m., and because the defendants were seated in a relatively small automobile where the passengers could access weapons inside the passenger compartment, the police could infer a common enterprise in the defendant knowing of his companion's arrest warrants and wanting to

-16-

conceal evidence of wrongdoing; and (iii) the detention, arrest, and search occurred late at night in a high-crime area, and thus officers could not clearly tell whether the defendant had weapons in the vehicle within reach.  See id. at 1212-13.

The facts here are not as strong as those in Dennison.  First, although the stop did occur in a high crime area, it occurred sometime in the early evening in the summer.  Second, because the stop did not occur at night, the officers had a better view, although still somewhat limited, into the vehicle and thus had a better opportunity to determine whether there were weapons in reach.  Third, the officers did not have specific information that any occupants in the vehicle had prior arrest warrants and certainly not an outstanding arrest warrant for a weapons violation.  Here, the stop occurred in a high crime area and one occupant acted in a suspicious manner.  Notably, Stubbs did not start acting in a suspicious manner until the officers were at the car and could see into the car. The officers were on opposite sides of the car and could see into the vehicle from their different perspectives.  This situation is, in material ways, different from that in Dennison, where the officers could not, in the dark, see into the truck containing a known weapons violation felon.

The Tenth Circuit in United States v. Shareef found that officers had sufficient individualized suspicion to display firearms, conduct a pat-down search, and use handcuffs on defendants where: (i) officers reasonably believed that three cars were traveling in caravan; (ii) the police suspected, based on a National Crime Information Center teletype describing an individual wanted on a weapons charge, that one of the defendants was that wanted individual and was armed and dangerous; (iii) the defendants' failed to produce licenses or to pull over when the police signaled; and (iv) the police confronted the defendants in their cars, at night.  See 100 F.3d at 1496-97, 1506.

The facts here, again, are different.  There the cars were traveling together, and the driver of

each car suspiciously could not present a driver's licence.  The cars failed to pull over when the police signaled, and the police confronted the cars at night.  Also, the police had a teletype of an individual wanted on a weapons charge that they thought matched one of the defendants.  Here, the stop occurred in the early evening in the summer, and the only suspicious activity occurred while the officers were at the car and only by one occupant.  The other occupants did not do anything that was suspicious.  The facts here are not sufficiently close to those in Shareef to warrant a patdown.  There is no evidence here connecting Stubbs with the other occupants in a common enterprise of illegality.

The facts before the Court appear more analogous to the facts in United States v. Gorman, 66 Fed. Appx. 801 (10th Cir. 2003)(unpublished)(divided panel)(Kelly, Paul J., writing for the majority, including Holloway, William J.; Tacha, Deanell, Chief Judge, dissenting).[4]  There the Tenth Circuit found that officers did not have a reasonable articulable suspicion that defendant was armed and dangerous based on: (i) the defendant's persistent refusal to exit the vehicle when ordered to do so; (ii) the defendant's production of a small pocket knife upon officer inquiry; and (iii) his "furtive movements upon exiting the vehicle consisting of turning away from the officers, taking several steps away from them," and his hands disappearing near his waistband area.  Id. at 803.  In Gorman, that the police could not see Gorman's hands was insufficient to create a reasonable suspicion that he was armed and dangerous because the officers observed no bulge in the defendant's clothing, the officers did not have a reasonable belief that he was engaged in any criminal activity, and the officers had no reason to believe, other than the movement to his waist, that he could have

---

[4] The Tenth Circuit Rule 36.3(B) states: "Citation to an unpublished decision is disfavored.  But an unpublished decision may be cited to if: (i) it has persuasive value with respect to a material issue that has not been addressed in a published opinion; and (ii) it would assist the court in its disposition."  This unpublished decision meets both these criteria, and the rules therefore allow citation to this unpublished decision.

been armed and dangerous.  See id. at 803-04.  Similarly here, although Stubbs' actions here are more suspicious than those in Gorman, in that Stubbs shoved his hands behind his back and into his pants, and he started screaming and crying, those actions are not reasonably extended to Baity. Baity's situation is more closely analogous to Gorman in that there was no reasonable belief that Baity was engaged in criminal activity, Baity sat quietly and still with his arms in his lap, or at his side, and is only connected to Stubbs by Stubbs' movements.  Baity's connection to Stubbs' movements is analogous to the defendant in Gorman who actively put his hand out of police view and at his waistband.  Norris saw Baity's hands at his sides and saw that Stubbs had put his hands "directly behind his back."   The officers did not have an articulable reasonable suspicion that a gun was transferred to Baity and that Baity was armed and dangerous.

The Court, in its ruling, does not minimize the dangers involved in police work, especially in a high crime area.  If the officers had actually seen a gun in the car, at some point, or if the officers had seen some evidence that Stubbs was passing a weapon, or even if Norris had not testified that Baity's hands were at his side, that Stubbs' hands were directly behind his back and that Norris would have let Baity leave, the Court may have found that the officers had a reasonable suspicion that Baity was armed and dangerous.  The United States has not, however, met its burden in producing sufficient evidence to show that the officers had a reasonable suspicion that Baity was armed and dangerous.  The patdown of Baity was unlawful.  Because the patdown was unlawful, the Court will suppress the drugs as a result of the unlawful patdown, and because the gun and ammunition were found after the drugs were discovered and Baity was placed in handcuffs, the Court will suppress the gun and ammunition.  See Wong Sun v. United States, 371 U.S. at 484-88. The Court will also suppress the statements Baity made later that day after his unlawful patdown and

-19-

arrest.  See id.[5]

**IT IS ORDERED** that the Defendant Jamare Baity's Motion to Suppress Evidence Resulting

From the Unlawful Search of His Person is granted.  The Court will suppress the seized drugs, gun,

ammunition, and statements made by Baity.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
   United States Attorney for the District of
      New Mexico
Stan Whitaker
   Assistant United States Attorney for the District of
      New Mexico
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Benjamin A. Gonzales
   Assistant Federal Public Defender
Albuquerque, New Mexico

        *Attorney for the Defendant*

---

[5] The United States did not, at the hearing or in its response, argue that, if the Court found that the patdown was unlawful, the taint was purged as to any of the subsequently obtained evidence. See generally Response; Transcript of Hearing.

-20-